611 A.2d 1008

**David DAVIS**

v.

**STATE of Maryland.**

**No. 954, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Sept. 2, 1992.

Certiorari Granted Dec. 22, 1992.

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Tarra DeShields–Minnis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before MOYLAN, FISCHER and HARRELL, JJ.

MOYLAN, Judge.

In terms of popular and frequently recurring issues in criminal cases, even a cursory survey of the year's docket confirms what our senses have already told us. The voguish "Contention of the Year" for the September, 1991 Term has been that defendants are entitled to a broader scope of inquiry during the jury selection process than is typically allowed. Consistently (largely in unreported opinions), we have rejected the contention. Persistently, it continues to appear. In the hope of some relief, we here reaffirm—categorically and for reporting—the well-settled limits that have long circumscribed and shall continue to circumscribe the *voir dire* examination of prospective jurors in Maryland, whatever the permitted latitude may be elsewhere.

The appellant, David Davis, was convicted by a Baltimore City jury, presided over by Judge David Ross, of the possession of cocaine with intent to distribute and the possession of heroin with intent to distribute. Upon this appeal, he raises three contentions:

1) That Judge Ross erroneously refused to ask whether any of the prospective jurors "has been a member or is a member of the law enforcement community or whether they have a close relative or friend who is such a member?";

2) That Judge Ross erroneously allowed the prosecutor to make a missing witness argument to the jury; and

3) That Judge Ross erroneously allowed the prosecutor to make an inflammatory closing argument.

In qualifying the jurors initially, Judge Ross put six questions to the venire panel as a whole:

1) He asked whether any of the prospective jurors had any knowledge or information about this particular case.

2) He asked whether any of the jurors knew a) the appellant, b) defense counsel, c) the assistant state's attorney, d) Officer Andrew Bratcher, the chief police investigator and only State's witness; or e) Mary Easley, a witness for the defense.

3) He inquired as to whether any of the jurors "has been or ... has a close relative who has either been the victim of or has been charged with or convicted of a drug related crime."

4) He asked whether any of the jurors is "likely to give more or less weight to the testimony of a police officer merely because that person is a police officer."

5) More generally, he inquired as to whether any of the jurors "knows of anything that would keep him or her from giving a fair and impartial verdict in this case."

6) Again more generally, he also asked whether any of the jurors "knows of any reason why he or she should not sit on the jury in this case."

Defense counsel then requested Judge Ross to pose to the panel the additional question of whether any of them had ever been a member of the law enforcement community or had a close relative or friend who was or had been a member of the law enforcement community. Counsel expressed his disdain for "the sort of omnibus question if

anybody has any reason they shouldn't serve" as unrealistic and inadequate. Counsel indicated that the primary purpose of the requested supplemental question was to assist him to "bring ... my experience and skill to bear to strike a jury I feel would be fair to my client." His aim was to be "in a position to use ... peremptory strikes intelligently." Judge Ross declined to ask the supplemental question.

The positive law regulating *voir dire* examination in Maryland, of course, is exceedingly meager. Maryland Rule 4–312(d) (formerly Rule 752) provides in pertinent part:

"The court may permit the parties to conduct an examination of prospective jurors or may itself conduct the examination after considering questions proposed by the parties. If the court conducts the examination, it may permit the parties to supplement the examination by further inquiry or may itself submit to the jurors additional questions proposed by the parties."

Beyond those bare provisions, there is only case law.

## Two Views of Voir Dire

In terms of case law, there are abroad in the land two diametrically incompatible attitudes as to the proper purpose, and therefore the proper scope, of *voir dire* examination. There is an expansive vision, indulged in states such as California and Florida and New York, where jury selection in celebrity cases may consume three or four weeks. Under such a regime, *voir dire* questioning is frequently addressed to prospective jurors one by one rather than to a panel of them *en masse*. The questioning, moreover, is frequently conducted by the advocates themselves, championing their respective causes with every intonation and every smile and grimace, rather than by a judge, speaking neutrally for an impersonal institution. The quintessential character of the expansive vision, however, emerges with the permitted subject matter of the questioning. Concern with mere challenges for cause is no more than a passing gesture. The multiple aims are far more encompassing.

The better to pursue those aims, young advocates (and old) pay handsome tuitions at exotic resorts to sit at the feet of storied masters of trial advocacy. They hear wondrous accounts of how virtually unfettered *voir dire* may in the hands of an astute psychologist be employed 1) to psychoanalyze the prospective juror so that the advocate can predict with almost mathematical certainty how the juror will react to a given fact pattern in the case that is about to unfold; 2) to "strike a deal" (a favorite cliche at such seminars) with a juror, so that if certain evidentiary developments come to pass, the juror is almost honor-bound to respond in the "agreed" fashion; and 3) to hypnotize or to condition the juror in advance of the trial proper as to the advocate's theory of the case. The fledglings hear endless tall tales of famous cases won or lost on *voir dire*. At the very least, these are rollicking good war stories told by entertaining spinners of yarns and everyone comes away with a sense of the tuition having been well-spent.

To this school of thought, mentor and pupil alike, expansive *voir dire* is the ultimate palladium of liberty, fair play, and justice. It is the jewel in the crown of trial by jury.

There is, however, an opposing school of thought that looks upon such indulgence as errant, if not grotesque, foolishness. Many of the war stories of the Olympians are dismissed as self-serving nonsense, more pertinent to the Book of the Month Club than to the courtroom. In terms of the profligate waste of precious courtroom and human resources, it looks upon any fractional gain from unlimited *voir dire* as a minimally incremental benefit that soon passes the point of diminishing returns. In a world of finite resources, if the fabled "day in court" is permitted casually to multiply into twenty days in court, the inevitable consequence is that, by the inexorable law of mathematics, nineteen other litigants are denied any time in court at all, save only the few moments required for the tendering of their negotiated pleas.

Where this more austere school of thought prevails, the prospective jurors are almost always questioned, by com-

mon practice if not by requirement of law, *en masse* rather than one by one. The questioning, moreover, by common practice if not by requirement of law, is conducted by the judge and not by the individual advocates. The premium is on efficiency and economy. Of even more significance, the subject matter of the questioning is limited to those things that would establish challenge for cause—to those things that go to the essential and fundamental impartiality of the jury. It is, in the last analysis, trial by an impartial jury that is constitutionally guaranteed, not trial by a sympathetic jury nor trial by a favorably predisposed jury. A jury of one's peers [1] is not a jury of one's clones. According to this less grandiose "core" vision, a defendant is entitled to a basically impartial jury and no more. He is not entitled to every last "tilt" or "edge" or favorable predisposition that a skilled advocate might, with time and latitude, be able to wring from a more prolonged and indulgent process. Conversely, he is not insured against every countervailing "tilt" or "edge" or unfavorable predisposition that a skilled advocate might, with time and latitude, be able to clear from his path. Although the deck may not be stacked against him, he may nonetheless end up with a difficult hand to play.

Since there is no ultimate constitutional right to peremptory challenges at all, either version of the antecedent ritual—the expansive approach or the Spartan approach—passes constitutional muster. When a constitution places no value on the *voir dire* guessing game itself, it is perforce indifferent on the sub-issue of informed guessing

---

1. The very phrase "a jury of one's peers," transplanted to this side of the Atlantic, is, of course, a nonsensical cliche. It takes its exclusive meaning from the English tradition of stratifying the classes and rigidly separating the treatment of commoners from that of noblemen. The guarantee of a jury of one's peers assured a commoner that he would be judged only by his fellow commoners. Conversely, however, it also assured a member of the peerage that he could be tried only by a jury of his fellow peers. It has no meaning in this country which has long since abolished all official distinction between the gentry and the folk.

versus wild guessing. The choice of competing visions or philosophies as to *voir dire* examination is, when all is said and done, a policy call that must be made state by sovereign state.

### Maryland Chooses the Spartan View

Maryland made its choice at the turn of the present century. *Handy v. State*, 101 Md. 39, 60 A. 452 (1905), was a capital case. Henry J. Handy had shot and killed his wife "under circumstances ... of extraordinary deliberation and set purpose." He attempted to establish that he had been goaded into the murder because "he believed she allowed and encouraged improper attentions from one Thomas." The appellant there raised two issues before the Court of Appeals, both involving limitations that had been placed upon his *voir dire* examination of prospective jurors. He complained 1) that he had not been allowed, through his counsel, to propound questions directly to a juror but had only been permitted to do so through the medium of the trial judge, and 2) that he had not been permitted, even through the medium of the judge, to inquire as to the marital status of one of the prospective jurors so that he could enlighten himself "as to the propriety of exercising the right of peremptory challenge." The Court of Appeals acknowledged, 101 Md. at 40–41, 60 A. 452, that on both of the closely related issues, it was writing on a clean slate:

"There is no statute in this State upon the subject, and we have been referred to no case in this State in which either of these questions has been decided or presented. The decisions in other States are conflicting ..."

In opting for the more Spartan approach, the Court of Appeals first sounded three themes, which have reverberated regularly for the ensuing eighty-seven years. Quoting with approval several academic authorities, it held that in the absence of a statute to the contrary, " 'The control of the trial of challenges, and of all the proceedings by which a jury is finally selected from those summoned and from the

bystanders, is committed to a wide discretion of the Court.' " 101 Md. at 41, 60 A. 452.

On the sub-issue of whether the questioning of jurors should be by the respective advocates or by the judge, the Court of Appeals held that " 'it lies in the discretion of the Court either to put the questions or to allow the counsel to examine.' " *Id.* The Court expressed agreement with the Texas Court of Appeals in *Stagner v. State,* 9 Tex.App. 440, 451 (1880), where it was said:

> "[T]he Judge should either himself conduct the examination, or at least so far conduct it as to confine it to the point under [investigation], and not permit it to take so wide a range to entrap the unwary juror into letting fall some expression not seriously and understandingly made, and from which it may afterwards be argued that he was not an impartial juror in the case. The juror should be treated with the utmost fairness in the examination, and not be subjected to the rigid cross-questioning sometimes indulged in in cross-examining a witness who is testifying in a case."

*Id.* at 451.

The third and closely related issue was whether a defendant, charged with the deliberate murder of his wife and apparently claiming adulterous provocation at least in mitigation, was entitled to inquire as to whether a prospective juror was a "married man." The Court of Appeals held that he was not so entitled, because the answer, whichever it was, would not have established a cause for disqualification. The Court looked favorably to *Regina v. Stewart,* 1 Cox C.C. 174 (1845), which had held that a defendant, on trial for the larceny of goods from tradesmen, was not permitted to inquire of a prospective juror whether that juror "was a member of an association for the prosecution of parties committing frauds on tradesmen." 101 Md. at 41, 60 A. 452. The Court of Appeals quoted with approval from the English decision: " 'Where a party has a right of challenge, he is not entitled to ask a juryman questions for the purpose of eliciting whether it would be expedient to

exercise such right.' " *Id.* The Court of Appeals quoted with approval from *Bales v. State,* 63 Ala. 30, 38 (1879): " 'We know of no authority, and we perceive no reason for any such speculative, inquisitorial practice, consuming needlessly the time of the Court, and offensive to the persons subjected to it.' " *Id.* at 42. It quoted with approval *State v. Creasman,* 32 N.C. (10 Ired.) 395, 397 (1849): " 'A party has no right to examine the juror, or any other person, by way of fishing for some ground of exception.' " *Id.*

The Court of Appeals committed itself to this more austere view of the *voir dire* process with full knowledge that other jurisdictions had taken contrary positions:

"We are aware that there are decisions to the contrary in other Courts of equal authority and reputation, but such knowledge as we possess of the experience in practice under those decisions does not commend them to our adoption."

101 Md. at 43, 60 A. 452.

The next occasion the Court of Appeals had to revisit the subject was in *Whittemore v. State,* 151 Md. 309, 134 A. 322 (1926), with Chief Judge Bond writing for the Court. One of the issues was the refusal of the trial judge to allow the defendant, in a capital murder case, to inquire of a juror, listed as retired, as to his age and his former business. The defense complained that it needed this information "in order to aid counsel in deciding whether to exclude that juryman by a peremptory challenge." 151 Md. at 311, 134 A. 322. The Court of Appeals upheld the trial judge, reaffirming the stand it had earlier taken in *Handy v. State:*

"The appellant does contend, however, that the decision in *Handy v. State* does not settle the point of the propriety of questions on behalf of one side or the other for aid in determining whether to exercise the right of peremptory challenge. But we think it does so settle the point, at least as it arose in that case. And our conclusion is that, while such questions as were excluded in this case would not in themselves offend against any rule, and, without

error, might have been admitted, as they commonly are admitted, still, under the decision in *Handy v. State*, it was within the discretion of the trial court to exclude them as questions for peremptory challenges purely, and there was no error in the court's doing so."

151 Md. at 313, 134 A. 322.

After also reaffirming that "the subject is not one covered by rigid rules, but is committed largely to the sound discretion of the trial court in each case," 151 Md. at 314, 134 A. 322, the Court pronounced its ruling on the first of the two issues before it:

"The rule is, then, that questions, not directed to a specific reason for disqualification and exclusion by the court, may be refused in the court's discretion."

151 Md. at 315, 134 A.2d 322. The Court pointed out that the questions "excluded in this case were for no specified purpose, and apparently with no question of disqualification in mind, but were merely beginning a process of examining at large, in order to form impressions and preferences, which, while they might properly be made the ground for peremptory challenges, would not test the eligibility of the jurymen. The exclusion was not an improper exercise of the court's discretion." 151 Md. at 315–316, 134 A. 322.

That same year, *Beck v. State*, 151 Md. 615, 620, 135 A. 410, 412 (1926), reaffirmed the holding from *Handy* that it is totally within the discretion of the trial judge whether to propound the *voir dire* questions himself or to permit such questioning to be done by the respective advocates.

The case law that followed on this subject for the next several decades simply routinely reiterated the limited focus of the *voir dire* examination upon disqualification for cause. *State v. Welsh*, 160 Md. 542, 544, 154 A. 51 (1931) ("[T]he examination which the party is thus entitled to have made is only a means to the end of ascertaining the existence of cause for disqualification, and is not permitted for any other purpose."); *Lee v. State*, 164 Md. 550, 557, 165 A. 614, 617

(1933); *Cohen v. State,* 173 Md. 216, 224, 195 A. 532 (1937); *Corens v. State,* 185 Md. 561, 564, 45 A.2d 340 (1946).

As a means of confining the questioning to the pursuit of actual disqualification and of inhibiting it from being used for a peripheral purpose, an analytical appreciation of the role of the omnibus or compound question as opposed to a series of fragmented or simple questions emerged in *Adams, Nelson and Timanus v. State,* 200 Md. 133, 88 A.2d 556 (1952). A licensed physician, a registered nurse, and a secretary were on trial for the crime of abortion. The defendants objected that they were not permitted to interrogate prospective jurors about their religion or church affiliation. The judge simply asked the compound question: "Is there any reason which will prevent any one of you from giving each of the defendants a fair and impartial trial and finding a verdict based only on the law and the evidence, such as your ... religious scruples or any other reason?" *Id.* at 140, 88 A.2d 556. To the compound question, one prospective juror raised his hand and stated, "I don't approve of abortions." *Id.* The court excused that juror for cause.

Clearly, the omnibus answer does not supply the defendant the bonus data that might be gleaned from a pair of fragmented answers. If the omnibus questionee responds that his religious beliefs might prevent him from rendering a fair and impartial verdict, the prospective juror is disqualified for cause, the defendant will give no thought to a possible peremptory, and all is well. If the omnibus questionee answers in the negative, on the other hand, the defendant is perplexed. Was the negative answer motivated by the essential absence of religious convictions themselves or was it inspired, rather, by a grim and determined resolution to render a fair and impartial verdict notwithstanding those tugging predilections? In the latter case, the defendant, if only he could know, would fire off a

peremptory and take no chances.[2]

On so sensitive a subject as abortion, touching as it does powerful religious beliefs, it would obviously have assisted the defendants, in their use of peremptory challenges, to know the religion of a prospective juror. The Court of Appeals held firmly to its guns, however, that the compound question sufficed and that any less sweeping question about denominational affiliation would not *ipso facto* establish a ground for disqualification:

"It would obviously serve no useful purpose to interrogate prospective jurors about their religious or church affiliation unless such affiliation would be a ground for disqualification. Religious or ethical beliefs as to the practice of abortion may range from a view that abortion, or even contraception, in any form or under any circumstances is morally wrong, to a view that the prevention of an unwanted child may be morally right, under circumstances not directly related to the mother's physical survival. But unless such beliefs would prevent an impartial consideration of the evidence and a proper application of the existing law, they would not disqualify. The court's inquiry was directed towards religious scruples with this proper qualification. We find no abuse of discretion."

200 Md. at 140–141, 88 A.2d 556.

As Maryland held fast to the narrower focus on *voir dire* examination, it became clear that the preferred interrogatory mode, which the trial judge in his discretion may insist upon, is to design a single, lethal question that goes straight to the jugular of disqualification. It is an all-or-nothing enterprise with no intermediate stages. The more tentative two or three-step progression toward the jugular issue is frowned upon (and in the discretion of the trial

---

2. Nothing, of course, is more delightfully ambiguous then a simple answer to a compound question. Picture the frustration of the intrepid confrontationalist challenging his adversary with a bold "Are you a patriot or are you a traitor, sir?", only to receive the benign answer "Yes." It is hardly an adequate motive for a duel or a peremptory strike.

judge may be, indeed, forbidden), because it can be manipulated to serve, or may gratuitously serve even absent manipulation, extraneous and disfavored purposes.

## The Maryland Approach at the Half–Century Mark

*Bryant v. State*, 207 Md. 565, 115 A.2d 502 (1955), a capital first-degree murder case, has significance because, instead of routinely applying settled law, the Court of Appeals seized the occasion, through Judge Delaplaine, to rethink its position philosophically. It did so, incidentally, as the *Handy* doctrine reached the half-century mark. It pointed out, "The practice of submitting questions to jurors on their *voir dire* has not been uniform in the United States." 207 Md. at 581, 115 A.2d 502. It then contrasted the more Spartan handling of *voir dire* examination in Massachusetts with the more latitudinarian handling of such examination in Florida. It recapitulated Maryland's first addressing of the problem in *Handy v. State*, and then affirmatively resubscribed to the *Handy* position:

"The question as to the proper practice in conducting *voir dire* examinations in Maryland came before the Court of Appeals in 1905 in *Handy v. State* ... [T]his Court held that when a juror is sworn on his *voir dire* and is declared by the court to be qualified, counsel for the defendant is not entitled to interrogate the juror generally for the purpose of determining whether or not to exercise the right of peremptory challenge. *That rule has been reaffirmed in subsequent decisions, and we see no reason to change it.*" (emphasis supplied).

207 Md. at 582, 115 A.2d 502.

## Into the Second Half–Century

The thirty-seven years that have thus far transpired in the second half-century of the life of the *Handy* doctrine have served only to see its precedential roots dig themselves more deeply into the common law of Maryland and to hear the themes first tentatively announced there sound and resound on numberless occasions, developing more ful-

ly in the process of repetition and fresh application. There are at least three distinct melodic strains that have developed, as well as a pervasive theme that underlies them all.

*A. The Trial Judge's Discretion:*

██  The pervasive theme that underlies any consideration of what happens in the course of *voir dire* examination of jurors is that it is something entrusted to the wide discretion of the trial judge. In *Handy v. State* itself, Judge Pearce established that both 1) the decision to have the questions propounded by the court or by the respective advocates and 2) the decision as to whether to permit a particular question are entrusted to the broad discretion of the trial judge. Maryland Rule 4–312(d) confers almost total discretion upon the judge with respect to the handling of *voir dire* examination. As recently as 1989, *Bedford v. State*, 317 Md. 659, 670, 566 A.2d 111 (1989), reaffirmed the discretion of the trial judge with respect to both the nature and the extent of the *voir dire* examination:

> "In Maryland, no statute or rule exists specifically regulating how *voir dire* is to be conducted, and this Court has determined that the nature and extent of the procedure lies solely within the sound discretion of the trial judge."

*Grogg v. State*, 231 Md. 530, 532, 191 A.2d 435 (1963), had affirmed that "the nature and extent of *voir dire* examination rests in the sound discretion of the trial court." In *Langley v. State*, 281 Md. 337, 341, 378 A.2d 1338 (1977), Judge Smith observed for the Court of Appeals:

> "This Court has observed on a number of occasions that ... the subject is not covered by rigid rules, but is committed largely to the sound discretion of the trial court in each case."

Judge Hammond had spoken to the same point in *McGee v. State*, 219 Md. 53, 146 A.2d 194 (1959):

> "It is settled in Maryland that in examination of jurors on their *voir dire*, the court may frame its own questions and not permit cross-examination by counsel, that the

extent of the examination rests in the sound discretion of the court, and that the purpose of the inquiry is to ascertain 'the existence of cause for disqualification and for no other purpose.' "

In terms of what questions may be asked, *Corens v. State*, 185 Md. 561, 564, 45 A.2d 340 (1946), stated unequivocally that that is a discretionary call by the trial judge:

"In Maryland there is no statute or precise rule prescribing the questions which should be asked a prospective juror on his *voir dire* in order to determine his qualification, but the subject is left largely to the sound discretion of the court in each particular case."

In terms of who shall do the questioning, trial judge or individual advocate, *Tichnell v. State*, 297 Md. 432, 438, 468 A.2d 1 (1983), rejected squarely the defense contention that defense counsel rather than the trial judge should have been permitted to conduct the *voir dire*. Chief Judge Murphy stressed the discretionary nature of the trial judge's decision in this regard:

"Maryland Rule 752 permits, but does not require, individual *voir dire* examination of prospective jurors by counsel. The matter is committed to the sound discretion of the trial judge; there is no absolute right vested in counsel, constitutional or otherwise, to conduct individual *voir dire*."

In terms of the decision of whether the *voir dire* questions shall be propounded to individual prospective jurors one by one or to the entire panel *en masse*, *Colvin v. State*, 299 Md. 88, 102, 472 A.2d 953 (1984), emphasized the discretionary nature of the decision:

"To the contrary, as appellant concedes, in the absence of a statute or court rule to the contrary, as long as the selection procedure results in a fair and impartial jury, the method and manner of conducting a *voir dire* rests within the sound discretion of the trial court."

On numerous occasions, this Court also has observed the broad discretionary nature of the trial judge's various deci-

sions in handling *voir dire* examination. *Burnette v. State,* 32 Md.App. 277, 278, 360 A.2d 23 (1976), *rev'd on other grounds,* 280 Md. 88, 371 A.2d 663 (1977), observed:

> "In this State the nature and extent of the *voir dire* examination rests in the sound discretion of the trial judge."

*See also Vernon v. State,* 12 Md.App. 157, 160–161, 277 A.2d 635 (1971); *Carder v. State,* 5 Md.App. 531, 537–538, 248 A.2d 495 (1968).

■ As a general observation on the nature of appellate review, it should be noted that the discretionary character of the trial judge's decisions in this area places a weighty burden upon an appellant to show a clear abuse of discretion. Under the circumstances, instances of reversal on rulings such as these are exceedingly rare.

*B. Who Shall Conduct the Voir Dire Examination?:*

Because Rule 4–312(d) expressly provides that the trial judge "may permit the parties to conduct an examination of prospective jurors" or "may itself conduct the examination," it is not surprising that few appellants have challenged trial judges' decisions in this regard. One such challenge did occur in *Moore v. State,* 7 Md.App. 495, 256 A.2d 337 (1969). Defense counsel had asked to be permitted to conduct the *voir dire* personally. The request was denied. Pointing to practices in the federal courts and in other states, the defense claimed an abuse of the trial judge's discretion. In rejecting the claim, we noted 7 Md. App. at 503–504, 256 A.2d 337:

> "He contends that an examination by counsel is permitted in federal and other state courts and in some courts within the State of Maryland, but we fail to see how this would make the trial judge's action an abuse of discretion when the rule specifically permits what he did. His contention that counsel's questions would more readily elicit prejudice than the judge's is a matter, we think, that should be directed towards the rules committee or to the legislature rather than to this Court."

*See also Tichnell v. State,* 297 Md. 432, 437–438, 468 A.2d 1 (1983); and *Handy v. State,* 101 Md. 39, 41–42, 60 A. 452 (1905).

Not surprisingly, there has never been an instance in Maryland where the decision of a trial judge in this regard has been deemed to be a clear abuse of discretion calling for appellate reversal.

*C.  Should Jurors Be Examined Individually or En Masse?:*

Because Rule 4–312(d) does not address this issue expressly, the question of whether the prospective jurors may be examined individually or collectively has generated more appellate litigation than the companion question of who shall conduct the examination.  The resolution of the issue, however, is found within the overarching principle that all decisions in this general area, whether expressly referred to in the rule or not, are consigned to the wide discretion of the trial judge.

The issue first came before the Court of Appeals in *Connor v. State,* 225 Md. 543, 171 A.2d 699 (1961).  The appellant had requested individual rather than collective examination of the jurors.  The request was denied.  The Court of Appeals observed that different jurisdictions handle the problem differently, but concluded that there was no abuse of discretion on the part of the trial judge in conducting a collective examination:

"The propounding of the *voir dire* questions to the prospective jurors collectively rather than separately was not improper.  While this practice does not prevail in most of the counties, it has been the customary procedure in Baltimore City for many years; and, since no prejudice was shown to have resulted from the refusal of the court to examine each juror individually, we see no reason to disturb the prevailing practice.  There are jurisdictions where not to propound the questions separately has been held to be reversible error.  But in other jurisdictions, the refusal to ask the *voir dire* questions individually has

been upheld. In the absence of a statute or rule regulating the procedure, we think the matter should be left to the sound discretion of the trial court. While it would also be discretionary, it has never been, so far as we know, the practice anywhere in this State to examine each juror separately out of the presence of the remaining jurors." (citations omitted).

225 Md. at 549–550, 171 A.2d 699.

A slightly different twist was put on the issue in *Colvin v. State,* 299 Md. 88, 472 A.2d 953 (1984). There the claim was made that whatever the discretion permitted in noncapital cases, the unique circumstances of a capital case dictate individualized examination of prospective jurors so as to make any denial thereof a clear abuse of discretion. The argument was also made that individual examination does not simply enhance the fullness of communication between the examiner and the prospective juror but also permits the jurors to be examined *in camera,* out of the potentially contaminating presence of each other. The Court of Appeals flatly rejected the contention, holding 299 Md. at 101–102, 472 A.2d 953:

"[T]he appellant sought individualized *voir dire* examination of prospective jurors. The court denied the request pursuant to Maryland Rule 752. Appellant claims prejudicial error in this ruling. He contends that in death penalty cases the attitudes of jurors toward the death penalty must be inquired into and, as some jurors could be reluctant to answer truthfully to such inquiry, in the presence of other jurors, individual *voir dire* is necessary. However, *no authority has been brought to the attention of this Court, nor have we found any, mandating individual voir dire under any circumstances. To the contrary,* as appellant concedes, in the absence of a statute or court rule to the contrary, as long as the selection procedure results in a fair and impartial jury, *the method and manner of conducting a voir dire rests within the sound discretion of the trial court."* (emphasis supplied).

*See also Poole v. State,* 295 Md. 167, 186–187, 453 A.2d 1218 (1983); *Evans v. State,* 304 Md. 487, 514–515, 499 A.2d 1261 (1985); *Barber v. State,* 16 Md.App. 235, 240–241, 295 A.2d 814 (1972); and *Wooten–Bey v. State,* 76 Md.App. 603, 619–622, 547 A.2d 1086 (1988).

As with the related issue of who shall conduct the examination, on this issue, as well, there has never been an instance in Maryland where the decision of a trial judge has been deemed to be a clear abuse of discretion calling for appellate reversal.

### D.  The Permitted Focus of Voir Dire Examination:

In turning to an analysis of the permitted scope of *voir dire* questioning, there is no better place to begin than with the articulate statement of the controlling principles made by Chief Judge Murphy in *Couser v. State,* 282 Md. 125, 383 A.2d 389 (1978).

The starting point is the constitutional (federal and state) guarantee of an impartial jury. The constitutionally impartial juror is not necessarily, from a litigant's point of view, an ideal juror or a perfect juror. The impartial juror in the constitutional sense need not walk into the courtroom already possessed of inherent impartiality; it is enough that the juror be capable of achieving requisite impartiality. It was of this distinction that Chief Judge Murphy spoke, 282 Md. at 138, 383 A.2d 389:

"[T]he due process clause of the fourteenth amendment and Article 21 of the Maryland Declaration of Rights guarantee the right to an impartial jury to an accused in a criminal case; these constitutional guarantees do not, however, insure that a prospective juror will be free of all preconceived notions relating to guilt or innocence, only that he can lay aside his impressions or opinions and render a verdict based solely on the evidence presented in the case."

The limited screening process provided by challenges for cause is the mechanism we have devised to achieve that

fundamental impartiality. This is the primary (and the irreducible) goal of the jury selection process.

Sometimes, however, there also exists an additional or secondary goal. The device of the peremptory challenge, informed or uninformed, goes further and permits a litigant to fine-tune the selection process by striving for jurors who possess not simply the minimal impartiality required by the Constitution but who more nearly approach the litigant's image of the ideal or model juror. In those jurisdictions that take the expansive view of the jury selection process, *voir dire* questioning is used to pursue both these primary and secondary aims. It is resorted to not simply to probe for ultimate disqualification but also to assist in the intelligent deployment of peremptory challenges.

In those other jurisdictions, however, that take the more limited view of the jury selection process, *voir dire* is only permitted in the service of the primary goal and may not be used to provide guidance for peremptory strikes. Maryland, as we have discussed, is in this latter camp. It was this distinction that Chief Judge Murphy explained, 282 Md. at 138–139, 383 A.2d 389:

> "The constitutional right to an impartial jury is basically protected by questioning on *voir dire* examination aimed at exposing the existence of cause for disqualification and the law of this State accordingly so limits the scope of the information which may be obtained as a matter of right; it does not encompass asking questions designed to elicit information in aid of deciding on peremptory challenges."

*McGee v. State,* 219 Md. 53, 58–59, 146 A.2d 194, 196 (1959), pointed out that a trial judge may, in his discretion, "cut counsel a little slack" but is by no means legally required to assist in the service of the secondary purpose:

> "Questions not directed to a specific ground for disqualification but which are speculative, inquisitorial, catechizing or 'fishing,' asked in aid of deciding on peremptory challenges, may be refused in the discretion of the court, even though it would not have been error to have asked them."

In *Giles v. State*, 229 Md. 370, 378–379, 183 A.2d 359 (1962), the Court of Appeals reaffirmed that the compound question, going to the ultimate impact of a prejudice upon a juror's ability to render an impartial verdict, is all that is required in the service of the primary goal of insuring impartiality:

> "Since the only purpose of a *voir dire* examination is to probe for the existence of cause for disqualification, we think the general question asked was sufficient to determine whether any juror was biased or prejudiced for or against the defendants and whether his mind was free to hear and impartially consider the evidence and render a fair and impartial verdict thereon."

That *voir dire* examination in Maryland is designed to be employed exclusively in the service of the challenge for cause and not in the additional and gratuitous service of the peremptory challenge was recently reaffirmed by *Bedford v. State*, 317 Md. 659, 670, 566 A.2d 111 (1989):

> "The *voir dire* procedure has as its sole focus the disqualification issue, and is not permitted for any other reasons."

This is the common, integrating thread that runs through all of the case law. The theme, of course, has been played out in a myriad of factual settings, a few of which we will summarize for illustrative purposes.

—Exposure to Pretrial Publicity—

In *Kujawa v. Baltimore Transit Co.*, 224 Md. 195, 167 A.2d 96 (1961), the appellant wanted the jurors questioned about whether they had "read any article or literature or have you heard any discussion recently on amounts of verdicts in negligence cases, and, if so, have you formed any ideas with reference to amounts of jury verdicts?" 224 Md. at 200, 167 A.2d 96. In affirming the decision of the trial court not to ask the question, the Court of Appeals pointed out that "[c]learly the interrogatory ... was not so framed as to probe for the existence of cause for disqualification which is the sole purpose of the *voir dire* examina-

tion." *Id.* at 201, 167 A.2d 96. It concluded that "the question was in the nature of a 'fishing' expedition condemned by us in other cases." *Id.* It further pointed out that an acceptable juror need not come into court with a blank mind on issues of public concern:

> "A juror to be competent need not be devoid of all beliefs and convictions. All that may be required of him is that he shall be without bias or prejudice for or against the parties to the cause and possess an open mind to the end that he may hear and consider the evidence produced and render a fair and impartial verdict thereon."

224 Md. at 201, 167 A.2d 96.

In *Bremer v. State*, 18 Md.App. 291, 307 A.2d 503 (1973), an assault with intent to murder case involving the assassination attempt on presidential candidate and Alabama Governor George Wallace, the defendant had requested simple *voir dire* questions directed expressly at whether the prospective jurors had seen certain films or telecasts, had heard radio or television news reports, or had read newspaper accounts or magazine articles about the shooting. The trial judge declined to ask the simple questions and instead propounded the omnibus question of whether the jurors had "read, seen, or heard anything about this case which would prevent you from rendering a fair and impartial verdict solely on the evidence adduced in court during trial?"

In affirming that ruling by the trial judge, Chief Judge Orth held that the compound question had fairly covered the subject matter of the simple questions and reiterated that "[t]he purpose of the *voir dire* examination is to ascertain the existence of cause for disqualification and for no other purpose." 18 Md.App. at 321, 307 A.2d 503. In pointing out further that mere exposure to pretrial publicity would not, *ipso facto,* render a prospective juror incapable of being impartial, the opinion quoted from the Supreme Court decision of *Irvin v. Dowd,* 366 U.S. 717, 722–723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):

> " 'It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days

of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' "

18 Md.App. at 322, 307 A.2d 503. *And see Brown v. State,* 220 Md. 29, 34, 150 A.2d 895 (1959).

It is to be noted that, in this case, Judge Ross gave the appellant more than that to which he was strictly entitled. Judge Ross asked the prospective jurors the simple question of whether any of them had any knowledge or information about the case.

—Involvement in Similar Crimes—

A favorite *voir dire* question is whether a prospective juror has been a victim of a similar crime. In *Yopps v. State,* 234 Md. 216, 198 A.2d 264 (1964), a defendant on trial for burglary sought to inquire as to whether any members of the jury panel or members of their families had ever had their homes burglarized. The Court of Appeals affirmed the decision of the trial judge not to ask the question, observing, 234 Md. at 221, 198 A.2d 264, "[I]t is our view that the question which appellant sought to have propounded to the jury did not relate to a cause for disqualification under the circumstances." *Twining v. State,* 234 Md. 97, 99–100, 198 A.2d 291 (1964), reached a similar result in a prosecution for bastardy with respect to the simple question of whether any prospective juror or member of the family of any prospective juror had "ever been in a situation similar to that of the prosecuting witness."

*Phenious v. State,* 11 Md.App. 385, 388, 274 A.2d 658 (1971), was an armed robbery prosecution where the defendant sought to inquire of the jury as to whether "any member of the jury panel or a member of their immediate family [has] ever been the victim of or a witness to a crime or crimes charged in the indictment." The trial judge declined to ask the question and this Court affirmed, stating 11 Md.App. at 388, 274 A.2d 658:

> "[T]he Court of Appeals has ruled that an inquiry concerning whether or not a prospective juror has been the victim or a witness to a crime similar to the one charged in the indictment is not a proper question on *voir dire* since it does not provide a basis for challenge for cause."

It is to be noted that on this subject of inquiry as well, Judge Ross gave the appellant more than that to which he was strictly entitled. Judge Ross asked the prospective jurors the simple question of whether any of them or a close relative of any of them had either been the victim of or been charged with or convicted of a drug related crime.

—Acquaintanceship With Parties, Lawyers or Witnesses—

As early as 1926, the Court of Appeals dealt with the question of whether a juror's acquaintanceship with one of the parties to the crime was, *ipso facto*, reason for disqualification, notwithstanding the assurance given by the juror that he could render an impartial verdict. *Whittemore v. State,* 151 Md. 309, 134 A. 322 (1926). The juror in question had known the murder victim some fifteen years before, had worked with him under the same employer for a summer, had seen him two or three times a week and had liked him. The bottom line, however, was that the juror stated that he could render an impartial verdict. In holding that the acquaintanceship was not, in and of itself, grounds for disqualification, the Court of Appeals stated 151 Md. at 316, 134 A. 322:

> "The juror himself expressed the opinion that he could render an impartial decision as a juror; and we do not see anything in the acquaintance with Holtman to contradict

that belief. Such mere acquaintance cannot of itself show partiality and disqualification for sitting in judgment. If it could, it would be almost impossible to obtain qualified juries in the less thickly populated parts of the state, where any man killed is likely to have been more or less well known to the entire population from which the jury would be drawn. We see no error in the trial court's exercise of its discretion in this ruling."

In *Lee v. State,* 164 Md. 550, 165 A. 614 (1933), counsel sought to inquire, for guidance in making peremptory strikes, whether any of the prospective jurors were acquainted with any of the parties to the case. The questioning was disallowed and the ruling was affirmed. Chief Judge Bond observed for the Court of Appeals at 160 Md. 544, 154 A. 66:

"Acquaintance of prospective jurors with parties does not disqualify them from serving in cases involving those parties."

In *Emery v. Asher,* 196 Md. 1, 75 A.2d 333 (1950), the trial judge had refused to permit questioning as to whether the prospective jurors knew "either of the plaintiffs; either of the counsel for plaintiffs; Mr. Asher [the defendant], any of his sons, or other officers of the defendant corporation; or any of the counsel for the defendant." 196 Md. at 6–7, 75 A.2d 333. In affirming the trial court, Judge Collins observed for the Court of Appeals, at 196 Md. 8–9:

"The questions refused appear to be more or less speculative or 'fishing' and such as not to test the eligibility of the prospective jurors. The appellants admitted during argument in this Court that they knew of no juror who sat, in the case who would have been disqualified if the proposed questions had been asked. We cannot say that the trial judge abused his discretion."

*And see Brown v. State,* 220 Md. 29, 34, 150 A.2d 895 (1959); *Bryant v. State,* 207 Md. 565, 583, 115 A.2d 502 (1955); *McGee v. State,* 219 Md. 53, 59–60, 146 A.2d 194 (1959).

It is to be noted that on this subject of inquiry as well, Judge Ross gave the appellant more than that to which he was strictly entitled. Judge Ross asked the prospective jurors the simple question of whether any of them knew the appellant, defense counsel, the assistant state's attorney, Officer Bratcher, or Mary Easley.

—Attitudes Arguably Pertaining to Trial—

In *Cardin v. State,* 73 Md.App. 200, 533 A.2d 928 (1987), the defendant, on trial for white-collar crime, sought to probe jurors' biases toward lawyers, bank practices, income tax practices, and wealth. In rejecting the contention, Judge Bloom observed for this Court, "The questions asked on *voir dire* must go to a specific issue of eligibility; the court may in its discretion refuse those questions which are speculative 'or in the nature of a fishing expedition.' " 73 Md.App. at 225, 533 A.2d 928. The holding was clear:

"The questions posed by Cardin and declined by the trial court were clearly designed to aid Cardin's attorneys in making peremptory challenges, not to disclose such bias as would justify dismissal of a juror for cause. The court was fully within its discretion in denying those questions."

*Id.* See also *Williams v. State,* 77 Md.App. 411, 421, 550 A.2d 722 (1988) (Trial for infanticide properly rejected *voir dire* questions about beliefs or positions on abortion). *And see Hunt v. State,* 12 Md.App. 286, 293, 278 A.2d 637 (1971).

—Relationship With Law Enforcement—

In *Bryant v. State,* 207 Md. 565, 115 A.2d 502 (1955), the defendant sought to inquire as to whether any of the prospective jurors had ever been clients of either of the assistant state's attorneys prosecuting the case. He "suggested that such an association would tend to influence a juror on the side of the state's attorney rather than on the side of the attorney whom he had never known." 207 Md. at 583, 115 A.2d 502. The Court of Appeals affirmed the trial judge's decision to disallow the question:

"There was no error in the judge's ruling. In Maryland there is no statute or specific rule prescribing the questions which should be asked a proposed juror on his *voir dire* to determine his qualification, but the subject is left largely to the court's discretion."

*Id.* *Goldstein v. State,* 220 Md. 39, 150 A.2d 900 (1959), involved a prosecution of police officers for vice-related corruption. One of the defendants sought to discover on *voir dire* whether any of the prospective jurors knew or were related to members of a large number of law enforcement constituencies, such as the Grand Jury, the Criminal Justice Commission, the Rackets Division, the Attorney General's Office, members of the State or City Police, and other persons including witnesses in the case. The questions were disallowed. The jurors had been asked, however, whether there was anything that would prevent them from rendering a fair and impartial verdict. In affirming the trial court's ruling disallowing the questions, the Court of Appeals stated, 220 Md. at 45, 150 A.2d 900:

"It is established that the purpose of the inquiry is to ascertain the existence of cause for disqualification and for no other purpose. Mere acquaintanceship with an individual or group is an insufficient basis for challenging a prospective juror for cause. This is true even as to a party to the litigation. It is generally held that mere relationship to witnesses, other than parties, is not a disqualification." (citations omitted).

In *Borman v. State,* 1 Md.App. 276, 229 A.2d 440 (1967), the trial judge declined to disqualify prospective jurors, three of whom were married to members of the police department and one of whom was friendly with several policemen. The appellant there argued that such association "with police officers indicated 'a distinct probability of preconceived attitudes and feelings on the part of those jurors which would adversely affect their ability to be impartial triers of law and fact.'" 1 Md.App. at 279, 229 A.2d 440. In rejecting the contention, we held:

"Neither mere acquaintance with an individual or group, nor mere relationship to witnesses, other than parties, is sufficient basis for challenging a prospective juror for cause."

*Id.* In *Harris v. State,* 82 Md.App. 450, 572 A.2d 573 (1990), we held, in a prosecution for the distribution of cocaine, that the fact that a juror was a former Maryland State Trooper was not, *ipso facto,* a cause for disqualification.

In *Shifflett v. State,* 80 Md.App. 151, 560 A.2d 587 (1989), the trial judge had put to the jurors the compound question of whether any of them had such close association with a law enforcement organization that it would in any way impair their ability to be fair and impartial. No one had responded in the affirmative. The defense attorney wanted to probe the law enforcement association *per se.* She insisted that she had "a right to know if any of them are related to law enforcement officers. There are policemen sitting out there by the dozen that are going to testify in the case and there might be some wives of police officers sitting on the panel, and I would like to know if there are any relations to jurors." In affirming the trial judge's ruling not to allow such fragmented inquiries, we observed 80 Md.App. at 156, 560 A.2d 587:

"While it is true that propounding the questions requested by appellant would have permitted appellant to use her peremptory challenges more intelligently because the effect of law enforcement employment or associations on the jurors' ability to render a fair and impartial decision was inquired into, it would not have developed disqualifying information." (citations omitted).

*Miles v. State,* 88 Md.App. 360, 594 A.2d 1208 (1991), involved an effort, after the jury had already been empaneled and started to hear the case, to disqualify a juror who realized and revealed that a police witness in the case was the father of one of her former students. The trial judge questioned the juror and was satisfied that that fact would not impair her ability to render a fair and impartial judg-

ment. This Court held that the trial judge's determination not to disqualify the juror simply because she was acquainted with a witness was not an abuse of discretion.

In all of the subject matter areas heretofore discussed, there has not been a single instance where the appellate court has held that the trial court abused its discretion in declining to ask a *voir dire* question that did not go to establish directly the disqualifying partiality.

### —The Clear Abuses of Discretion—

Those instances of clear abuse that have been found have all involved questions that should certainly have been propounded because an affirmative answer to them would have demonstrated, with nothing more needing to be shown, ultimate and disqualifying bias.

In *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 143 A.2d 627 (1958), the plaintiff, Harriet Casey, a parishioner, was suing the Archbishop, a corporation sole, for personal injuries arising out of the negligent maintenance of a church building. The plaintiff sought to inquire whether any prospective juror would have "any bias or prejudice ... against a suit in which Roman Catholic Archbishop of Baltimore ... is sought to be held liable in damages for injuries claimed to have resulted to ... a member of the Parish ... *that would prevent you from fairly and impartially deciding such a case.*" 217 Md. at 604, 143 A.2d 627 (emphasis supplied). A related question inquired whether there was "any member of the jury panel who *could not fairly and impartially assess damages ...* in the same manner as if the defendant were a regular corporation." *Id.* (emphasis supplied). The trial judge declined to ask the questions.

In reversing, the Court of Appeals held that the question the judge did ask, albeit referring generally to "religious scruples," was "in a form so general" that it "did not sufficiently indicate to the panel of jurors what possible bias or prejudice was being probed." 217 Md. at 606, 143 A.2d 627. The failure to inform the jurors "of the church

involved or the position of the religious corporation in the suit [defeated] the whole purpose of questioning jurors on their *voir dire.*" *Id.* The general question had referred only to a "religious corporation" which the jurors "might not even realize meant a church." *Id.* In probing something like religious bias, a litigant is entitled "to have questions propounded to prospective jurors on their *voir dire,* which are *directed to a specific case for disqualification.*" 217 Md. at 605, 143 A.2d 627 (emphasis supplied).

In *Brown v. State,* 220 Md. 29, 150 A.2d 895 (1959), the specific prejudice in issue was racial. In a capital murder case, the defendant had sought to explore several areas on *voir dire* and had been thwarted by the trial judge. He had not been permitted to inquire whether any of the prospective jurors had read or heard accounts of the case. That did not trouble the Court of Appeals:

> "[T]hat a prospective juror has read or heard accounts concerning the accused or the crime does not of itself disqualify him or raise any presumption of prejudice."

220 Md. at 34, 150 A.2d 895. The defendant had not been permitted to inquire whether any of the prospective jurors "were associated with or related to the attorneys in the case, either for the State or for the defense." 220 Md. at 33, 150 A.2d 895. That did not trouble the Court of Appeals:

> "The question as to the connection of any juror with the attorneys of the case did not have to be asked."

220 Md. at 34, 150 A.2d 895.

The analysis moved onto a different plane, however, when it came to the issue of racial prejudice. The defendant had wanted to inquire whether any prospective juror "had any prejudice against a Negro which would prevent [him] from giving a Negro as fair and impartial a trial as [he] would a white man." 220 Md. at 33–34, 150 A.2d 895. The Court of Appeals, observing that the failure to ask this question "falls into a different category," 220 Md. at 34, 150 A.2d

895, held that the failure to inquire as to a directly disqualifying bias or prejudice was an abuse of discretion.

A series of cases has consistently insisted upon the necessity to pursue on *voir dire* clearly disqualifying partiality based on racial prejudice. *Contee v. State*, 223 Md. 575, 578–581, 165 A.2d 889 (1960); *Humphreys v. State*, 227 Md. 115, 118–121, 175 A.2d 777 (1961); *Bowie v. State*, 324 Md. 1, 11–16, 595 A.2d 448 (1991); *Smith v. State*, 12 Md.App. 130, 131–132, 277 A.2d 622 (1971); *Tunstall v. State*, 12 Md.App. 723, 726–727, 280 A.2d 275 (1971); *Holmes v. State*, 65 Md.App. 428, 434–439, 501 A.2d 76, 79–81 (1985), *rev'd on other grounds*, 310 Md. 260, 528 A.2d 1279 (1987).

A third line of cases, where an abuse of discretion has been found for the failure to propound the *voir dire* question, involves the issue of whether a prospective juror would give more, or less, weight to the testimony of a policeman based solely upon the witness' status as a policeman. In *Langley v. State*, 281 Md. 337, 378 A.2d 1338 (1977), the defendant had requested an inquiry as to whether any prospective juror "would give more credit to the testimony of a police officer over that of a civilian, because of his status as a police officer." 281 Md. at 338, 378 A.2d 1338. The question was disallowed. Judge Smith thoroughly surveyed the case law throughout the country and concluded that a juror who answered such a question in the affirmative would be automatically disqualified because he had already prejudged a critical witness' credibility:

"A juror who states on *voir dire* that he would give more credit to the testimony of police officers than to other persons has prejudged an issue of credibility in the case. Regardless of his efforts to be impartial, a part of his method for resolving controverted issues will be to give greater weight to the version of the prosecution, largely because of the official status of the witness."

281 Md. at 348, 378 A.2d 1338. *See also Bowie v. State*, 324 Md. 1, 6–11, 595 A.2d 448 (1991); *Tisdale v. State*, 30 Md.App. 334, 338–339, 353 A.2d 653 (1976).

In the present case, Judge Ross did properly inquire as to whether any of the prospective jurors "feels they are likely to give more or less weight to the testimony of a police officer merely because that person is a police officer."

In many ways, the class of capital punishment cases is *sui generis*. Even there, however, the distinction between ultimate inability to be impartial and the merely troubling antecedent condition is critical. What matters is not whether a juror has conscientious scruples against capital punishment but only whether such conscientious scruples would make it impossible or difficult for the juror to return a fair and impartial verdict based on the evidence in the case. *Bowie v. State,* 324 Md. 1, 16–24, 595 A.2d 448 (1991); *Hunt v. State,* 321 Md. 387, 415, 583 A.2d 218, 231 (1990); *Grandison v. State,* 305 Md. 685, 724–726, 506 A.2d 580 (1986). *And see Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

### —Let's Pull It All Together—

Enough of microcosm! All of the foregoing categories are no more than variegated factual settings for a common phenomenon. There may be value in positing a unified field theory and attempting a broader statement of the principle.

In each instance, a compound question probing *both* A) the existence of a condition *and* B) the likely consequence of that condition has been deemed legally appropriate and required. In each instance, the severing of the inquiry into component parts has rendered the first component (A) (the existence of the condition), standing alone, legally inappropriate and not required.

This general rule applies, whatever the particular subject matter may be. The variation consists of nothing more than filling in a blank with respect to Condition A. Condition A, of course, can be anything. "Are you now or have you ever been a member of [the American Red Cross, the Ku Klux Klan, the Presbyterian Church, the Elks, a law

enforcement agency, the Communist Party, the Garden Club of Roland Park, etc.]?" Component B is a constant. "... and would such condition make it impossible (or difficult) to return a fair and impartial verdict based only upon the evidence in this case?" An affirmative answer to Consequence B is always a ground for disqualification, whatever its cause. It may be membership in the company of the saints and it will nonetheless disqualify. It will, therefore, always suffice if the trial judge simply propounds the question as to whether any prospective juror knows of any belief or any condition that would make it impossible (or difficult) for that juror to return a fair and impartial verdict based solely upon the evidence.

The legal wrangle invariably arises when battle-ready advocates, unlimbering the artillery of their peremptories and scanning the horizon for tempting targets, wish desperately to know about Condition A. Those states that consider it a proper function of *voir dire* to serve as ground reconnaissance for spotting peremptory targets permit the fragmentary inquiry. Those other states that do not consider it a polite function, with equal logic, disdain the partial inquiry. Whatever the value may be to the tactician in knowing the status of A, it is a value that is not legally cognizable in places like Maryland. Where the partial or fragmented inquiry serves no cognizable purpose, it logically is never required.

### Applying the General Principle

■ The single *voir dire* issue before us involves Judge Ross' refusal to inquire, at the specific request of the appellant, whether any of the prospective jurors or any close relatives or friends of the prospective jurors were then or had ever been members of the law enforcement community. Defense counsel made it indisputably clear that he wanted the information to guide him in his use of peremptory strikes:

"[F]or what other reason would I get ten peremptory challenges if I cannot make a halfway intelligent decision to make a strike?

Why in the world would we be given information on these sheets ... [except] to make an intelligent decision to make a strike?

. . . .

Even if you [don't] want to strike someone [for cause] who says, 'Yes, I'm a policeman but I can be fair,' counsel should at least be in a position to use [his] peremptory strikes intelligently."

Defense counsel makes a forceful case for the more expansive vision of *voir dire* examination. As we have pointed out, however, Maryland for eighty-seven years has rejected that view. Even if, as the appellant urges us to be, we were persuaded to alter course and to push for the more expansive version of *voir dire* (we are not), we could hardly conclude that Judge Ross had abused his discretion for adhering to what has been the regular and invariable dictate of the Maryland case law for almost a century. Needless to say, we do not so conclude.

Indeed, the appellant's invitation comes at a particularly unpropitious time in the life of the peremptory challenge. With more and more varieties of challenge for less than good cause coming under the cold glare of the Equal Protection Clause, *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Powers v. Ohio*, 499 U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Hernandez v. New York*, 500 U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Edmonson v. Leesville Concrete Co.*, 500 U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Georgia v. McCollum*, —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the institution of the peremptory challenge is, for the moment at least, in inglorious retreat. Many doomsayers are predicting its drastic curtailment, if not its total abolition. It is hardly the occasion to expand its implementation.

### The Other Contentions

■ We will deal more briefly with the appellant's remaining two contentions. In one of them, he complains that the State was permitted to make a "missing witness" argument over his objection. The only issue was whether the missing witness was someone peculiarly within his power to produce. *Christensen v. State*, 274 Md. 133, 134, 333 A.2d 45 (1975). The missing witness was his commonlaw wife and the mother of his child. Under the circumstances, she qualifies as one peculiarly within his power to produce. *Bruce v. State*, 318 Md. 706, 729–731, 569 A.2d 1254 (1990). We see no error.

■ The appellant's final contention is that the State made an inflammatory closing argument in referring to the fact that Baltimore is a city "infested with drug dealers," where drug dealers "peddle their trade on the public streets" and where "drug dealers have shoot-outs on the street." The description seems to accord remarkably well with daily accounts in the *Baltimore Sun*. In any event, closing argument is a robust forensic forum wherein its practitioners are afforded a wide range for expression. *Wilhelm v. State*, 272 Md. 404, 326 A.2d 707 (1974). Indeed, in *Wilhelm*'s companion case of *Cook v. State*, the prosecutor had referred, over objection, to the murder rate in Baltimore City and indicated that he did not know the number of people in the city who had been robbed with weapons. In failing to become unduly excited over these remarks, the Court of Appeals observed, at 272 Md. 439:

> "Jurors may be reminded of what everyone else knows, and they may act upon and take notice of those facts which are of such general notoriety as to be matters of common knowledge."

We see nothing improper in the argument in this case.

*JUDGMENTS AFFIRMED;*

*COSTS TO BE PAID BY APPELLANT.*