PER CURIAM.
Petitioner Dzhokhar A. Tsarnaev asks this court to compel the district court to grant a change of venue because of widespread pretrial publicity that he alleges has so tainted the potential jury pool that he will be unable to receive a trial before a fair and impartial jury in Boston. See generally Second Petition for Writ of Mandamus. We deny the Second Mandamus Petition because petitioner has not met the well-established standards for such relief and so we are forbidden by law from granting it.
The Supreme Court’s admonition over a century ago is true today:
The theory of the law is that a juror who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have that effect. In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.
Reynolds v. United States, 98 U.S. 145, 155-56, 8 Otto 145, 25 L.Ed. 244 (1878).
Thus, any high-profile case will receive significant media attention. It is no surprise that people in general, and especially the well-informed, will be aware of it. Knowledge, however, does not equate to disqualifying prejudice. Distinguishing between the two is at the heart of the jury selection process.
Trials have taken place in other high-profile cases in the communities where the *16 underlying events occurred. After the 1993 World Trade Center bombing, which killed six and injured over a thousand people and inflicted hundreds of millions of dollars in damage, the six conspirators charged were each tried in the Southern District of New York. The district court denied change-of-venue motions in each case, the first less than a year after the bombing. See United States v. Yousef, No. 512 93-Cr.0180, 1997 WL 411596, at *3 (S.D.N.Y. July 18, 1997); United States v. Salameh, No. S5 93-Cr.0180, 1993 WL 364486, at *1 (S.D.N.Y. Sept. 15, 1993) (finding less than a year after the bombing that a jury in New York would be “willing to try this case with an open mind” and able to “render a decision based solely upon the evidence, or lack thereof,” even if the jurors had heard of the bombing before). After the conviction in Yousef, the Second Circuit affirmed. United States v. Yousef, 327 F.3d 56, 155 (2d Cir.2003).
Indeed, after the September 11 terrorist attacks in 2001, the prosecution of Zacharias Moussaoui was brought in the Eastern District of Virginia, minutes by car from the Pentagon. The district court denied a change of venue motion, and the Fourth Circuit dismissed Moussaoui’s interlocutory appeal. United States v. Moussaoui, 43 Fed.Appx. 612, 613 (4th Cir.2002).
Further, the events here, like the 1998 bombing of the World Trade Center and the September 11, 2001 attacks, received national and international attention. Petitioner does not deny that a jury anywhere in the country will have been exposed to some level of media attention. Indeed, his own polling data shows that, in .his preferred venue, Washington D.C., 96.5% of survey respondents had heard of the bombings at the Boston Marathon.
The mandamus relief sought is an extraordinary remedy, rarely granted, and has stringent requirements. To convince an appellate court to intervene is to employ “one of the most potent weapons in the judicial arsenal.” Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 380, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (citation and internal quotation marks omitted). To compel the district court to change course, a petitioner must show not only that the district court was manifestly wrong, but also that the petitioner’s right to relief is clear and .indisputable, irreparable harm will result, and the equities favor such drastic relief. Id. at 380-81, 390,124 S.Ct. 2576. In the case before us, we cannot say petitioner has met these onerous standards and so relief must be denied.
I.
Petitioner is charged with multiple crimes arising out of the bombings at the Boston Marathon on April 15, 2013, killing three and injuring over 200. Some of these crimes potentially carry the death penalty. On June 18, 2014, petitioner filed his first motion to change venue claiming that pretrial publicity and the attendant public attitudes were so hostile and inflammatory that a presumption of prejudice had arisen requiring that he be tried in a different district. On September 24, 2014, the district court denied the motion in a thorough and detailed order. In its order, the court addressed the evidence used by petitioner in support of his motion and, applying the standards set out in Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), concluded that petitioner had failed to demonstrate that pretrial publicity rendered it impossible to empanel a fair and impartial jury in the District of Massachusetts. Petitioner did not seek mandamus at the time of the first motion’s denial.
On December 1, 2014, petitioner filed a second motion to change venue, arguing that the need for a change of venue had *17 become more acute because of continuing prejudicial publicity in the media and alleged leaks of information by government sources. On December 31, 2014, without waiting for the district court’s written decision on the second motion, petitioner filed his first mandamus petition with this court. On January 2, 2015, while that petition before us remained under consideration, the district court-issued its written decision on the second venue motion, noting .that the new motion did not raise any genuinely new issues apart from those in the first motion and concluding 'that no presumption of prejudice had arisen that would justify a change of venue. On January 3, 2015, this court denied the motion to stay jury selection and the first petition, concluding that petitioner had “not made the extraordinary showing required to justify mandamus relief.” In re Tsarnaev, 775 F.3d 457 (1st Cir.2015).
Jury selection commenced on January 5, 2015, and continues to date. On January 22, 2015, petitioner filed in the district court his third motion to change venue in which he asserted that the detailed and extensive questionnaires completed by the 1,373 prospective jurors comprising the venire, combined with the record of individual voir dire compiled to date, mandated a change of venue because of pervasive bias and prejudgment uncovered during that-process. After petitioner filed this Petition, the district court denied the Third Motion for Change of Venue, in part for the reasons set forth in its earlier decisions, and in part because “the voir dire process is successfully identifying potential jurors who are capable of serving as fair and impartial jurors in this case.” United States v. Tsarnaev, No. 13-CR-10200-GAO (D.Mass. Feb. 6, 2015). “In light of that ongoing experience,” the district court concluded, “the third motion to change venue has even less, not more, merit than the prior ones.” Id. The court further maintained that “[cjoncerns about jurors who have fixed opinions or emotional connections to events, or who are vulnerable to improper influence from media coverage, are legitimate concerns. The [cjourt and the parties are diligently addressing them through the voir dire process.” Id.
This court held a hearing on the Second Petition for Mandamus on February 19, 2015, and allowed supplemental filings.
The Second Petition for Mandamus before us largely makes the same claims and relies on the same types of data as the Third Motion for Change of Venue which the district court denied. Petitioner argues that a presumption of prejudice exists here because aggregated data shows too many in the community and in the jury pool have expressed the opinion he is guilty and that those jurors have been affected by, or have connections to, the crime. He claims the continuing media attention exacerbates these problems. He argues that the judge erred in rejecting his claim that presumed prejudice has been established. From this, he argues, voir dire cannot succeed in finding a fair and impartial jury. This is so, he argues, even if the trial judge after voir dire qualifies a jury after determining the jurors so qualified to be fair and impartial. At this point, the trial judge has not sat a jury, but rather has identified over sixty provisionally qualified jurors who are still subject to peremptory challenges.[1] We conclude that petitioner fails to demonstrate a clear and indisputable right to relief.
II.
The writ of mandamus is a “drastic” remedy; given its potential “to spawn *18 piecemeal litigation and disrupt the orderly processes of the justice system,” mandamus “must be used sparingly and only in extraordinary situations.” In re Pearson, 990 F.2d 653, 656 (1st Cir.1993) (citations and internal quotation marks omitted). It is reserved for the “immediate correction of acts or omissions” by the district court “amounting to an usurpation of power.” Id. (citation and internal quotation marks omitted). Indeed, “mandamus is generally thought an inappropriate prism through which to inspect exercises of judicial discretion,” In re Bushkin Assocs., Inc., 864 F.2d 241, 245 (1st Cir.1989), and the jury selection process involves some measure of discretion. “When pretrial publicity is at issue, ‘primary reliance on the judgment of the trial court makes [especially] good sense.’ ” Skilling, 561 U.S. at 386, 130 S.Ct. 2896 (alteration in original) (quoting Mu’Min v. Virginia, 500 U.S. 415, 427, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991)). We are unable to conclude that the district court’s reasoned conclusion based on the facts and the law in this case warrants issuance of such extraordinary relief.
A. The Mandamus Standard Applicable Here.
The intersection of two constitutional mandates lie at the heart of resolution of petitioner’s mandamus claim. First, both Article III and the Sixth Amendment provide that a criminal defendant shall be tried in “the State where the ... Crimes ... have been committed.” U.S. Const, art. Ill, § 2, cl. 3; see also id. amend. VI (right wherein the crime to trial by “jury of the State shall have been committed”).
Second, the Sixth Amendment “secures to criminal defendants the right to trial by an impartial jury.” Skilling, 561 U.S. at 377, 130 S.Ct. 2896; see also U.S. Const. amend. VI. This right,' ensuring the defendant “a fair trial,” has also been characterized as “a basic requirement of due process.” Skilling, 561 U.S. at 378, 130 S.Ct. 2896 (citation and internal quotation marks omitted). In some situations, these constitutional mandates may be in tension. Notwithstanding the constitutional command that trials take place where crimes are committed, the defendant’s rights to an impartial jury and a fair trial may require that in extreme cases the trial be moved to a venue other than where the crime was committed. We have described such cases as those where “there is an ever-prevalent risk that the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial.” United States v. Quiles-Olivo, 684 F.3d 177, 182 (1st Cir.2012).[2] In those rare, extreme circumstances it may be “a denial of due process of law to refuse the request for a change of venue.” Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).
Importantly, if petitioner goes to trial without a change of venue now and is convicted, he will have the opportunity to raise a challenge based on lack of a fair and impartial jury on direct appeal. Indeed, that is the customary mechanism by *19 which such challenges are presented and assessed. See, e.g., Quiles-Olivo, 684 F.3d at 182-84.[3]
Instead of traveling that typical route, petitioner asks this court for a writ of mandamus at this pretrial stage. And the mandamus petition in this case is particularly unusual. It came in the process of ongoing jury selection and is an attempt to prevent a trial in this jurisdiction from going forward. Petitioner urges this appellate court to intervene and halt that juror selection process in the trial court. He does so despite the fact that, the district court, sitting in the “locale where the publicity is said to have had its effect,” necessarily and properly under the law draws on its “own perception of the depth and extent of news stories that might influence a juror.” Mu’Min, 500 U.S. at 427, 111 S.Ct. 1899. The district court has not yet completed that process, and we are mindful that an appellate court’s “after-the-fact assessments of the media’s impact on jurors ... lack the on-the-spot comprehension of the situation possessed” by the trial judge. Skilling, 561 U.S. at 386, 130 S.Ct. 2896; see id. at 378 n. 11, 130 S.Ct. 2896 (“[D]istrict-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect.”).
Because petitioner’s venue claim “arises not on direct appeal after trial but on petition for a writ of mandamus,” it is subject to “an even more, exacting burden” than it would be on direct appeal. In re Bulger, 710 F.3d 42, 45 (1st Cir.2013).[4] The petitioner must “satisfy the burden of showing that his right to issuance of the writ is clear and indisputable.” Id. (citations, internal quotation marks, and alteration omitted). That standard of review is extraordinarily deferential to the ruling of the trial judge. In our cases, “mandamus has customarily been granted only when the lower court was clearly without jurisdiction, or exceeded its discretion to such a degree that its actions amount to a usurpation of power.” In re Recticel Foam Corp., 859 F.2d 1000, 1006 (1st Cir.1988) (internal quotation marks, citations, and alteration omitted). As we explain below, neither of those conditions is true here.
In addition to overcoming the daunting first requirement, petitioner must also meet two other standards. First, he must demonstrate that he has no other adequate source of relief; in other words, he must show irreparable harm. In re Bulger, 710 F.3d at 45 (citation omitted). This condition is “designed to ensure that the writ will not be used as a substitute for the regular appeals process,” Cheney, 542 U.S. at 380-81, 124 S.Ct. 2576 (citation omitted), which, as we have noted, remains open to petitioner after trial should he be convicted. Petitioner does not rely on an argument that he will suffer irreparable injury, but argues a failure to accept his argument is so obviously wrong, the irreparable injury is to the reputation of the federal judicial system. And, second, “a petitioner must demonstrate that, on balance, the equities favor issuance of the writ.” In re Bulger, 710 F.3d at 45.
*20 Together, these standards mean that, when considering a petition for the extraordinary writ of mandamus, an appeals court is bound to employ an extraordinarily deferential form of review. Relief may be allowed here only (1) if it is clear and indisputable that the district court erred in denying petitioner’s Third Motion for Change of Venue, (2) petitioner would suffer irreparable harm if the district court were not ordered to change venue, and (3) the equities clearly favor the petitioner. See id. at 45-46. These onerous standards have not been met here.

B. It is not Clear and Indisputable that Pretrial Publicity Requires a Change of Venue.

We are bound by the Supreme Court’s decision in Skilling, a case in which the venue question was examined after conviction. This case, by contrast, is an attempt to force a trial judge to change venue despite his findings that no presumption of prejudice has arisen, and that there are jurors provisionally qualified to date[5] capable of providing defendant with a fair trial. Skilling involved the criminal prosecution of Jeffrey Skilling, a former Enron executive, for certain crimes committed prior to Enron’s much-publicized collapse which badly harmed the city of Houston. Skilling twice moved to change venue from Houston, Enron’s home city, and the district judge denied both motions.[6] After Skilling was convicted of some, but not all, of the charges against him, he appealed, asserting, inter alia, a fair-trial claim which encompassed two questions: first, whether the district court erred by failing to move the trial to a different venue based on a presumption of prejudice and, second, whether actual prejudice contaminated the jury which convicted him.
The Supreme Court first surveyed and distinguished its earlier cases, including Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and discussed the differences between those cases and Skilling. The Court then discussed several considerations that informed its conclusion that the publicity in Houston had not produced a presumption of prejudice. First, the Court examined the size and characteristics of the community in which the crimes occurred. Out of Houston’s population, 4.5 million people were eligible for jury service, a much greater number than the small area the Court considered in Rideau. Second, while there was a widespread community impact from the crimes, Skilling held that with careful identification and inspection of prospective jurors’ connections to Enron, a jury with non-existent or attenuated links to Enron could be seated. The Court considered the “widespread community impact” of Enron’s failure and the guilty plea of a co-defendant shortly before trial, and concluded in each instance that the “extensive screening questionnaire and follow-up voir dire were well suited” to the task of identifying and inspecting the possible effects of these influences. Skilling, 561 U.S. at 384-85, 130 S.Ct. 2896. Third, while the press coverage of Skilling was “not kind,” the Court found it significant that the news stories about him “contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut *21 from sight.” Id. at 382, 130 S.Ct. 2896. Fourth, the Court noted that several years’ time passed between Enron’s collapse and Skilling’s trial during which the “decibel level” of media attention dropped. Id. at 383, 130 S.Ct. 2896. Considering all of these factors, the Court held that no presumption of prejudice arose and that the district court did not violate constitutional limitations in declining to change venue. Id. at 385,130 S.Ct. 2896.
It is apparent that petitioner cannot meet the high bar set for mandamus relief, based on the parties’ submissions and the parts of the record the parties have relied on in their arguments to us. Petitioner argues that the bombings have so impacted the entire Boston-area community that we must presume prejudice for any jury drawn from the Eastern Division of Massachusetts.[7] Yet his own statistics reveal that hundreds of members of the venire have not formed an opinion that he is guilty. The voir dire responses have confirmed this. Petitioner’s selective quotations from the sealed materials are, as the district court said, misleading. Our own review of those materials shows that the district court is in fact identifying provisionally qualified jurors with no or few and, at most, attenuated claimed connections to the bombings.
Boston, like Houston in Skilling, is a large, diverse metropolitan area. Boston-area residents obtain their news from a vast array of sources. By contrast, in Rideau, a 1963 case from Louisiana, the Court found it was a denial of due process to have refused a request for change of venue where at least 50,000 people in an area of 150,000 saw the video of a staged interview by the Sheriff resulting in a “confession” by defendant, who had not been advised of his right to counsel. 373 U.S. at 724-26, 83 S.Ct. 1417. The Supreme Court characterized this as a “kangaroo court.” Id. at 726, 83 S.Ct. 1417.[8]
While there has been extensive publicity in this case, the atmosphere here is not to be characterized as disruptive to the ability of the petitioner to be adjudged by a fair and impartial jury. This case is in sharp contrast with Estes v. Texas, 381 U.S. 532, 536, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), where pretrial publicity and the televising of proceedings in a notorious criminal case resulted in setting aside the conviction despite absence of showing of prejudice. This case is unlike the atmosphere of “bedlam,” in Sheppard v. Maxwell, 384 U.S. 333, 355, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), where the trial judge did not fulfill his duty to protect a murder defendant from inherently prejudicial publicity which saturated the community or to control disruptive influences in the courtroom during trial. Nor is this case marred by the repeated broadcast of a defendant’s questionable taped confession two months before trial in a small area of 150,000 people, as in Rideau, 373 U.S. at 724, 83 S.Ct. 1417. As petitioner’s *22 counsel has admitted, there is no confession at all here. Indeed, much of what petitioner calls “publicity” consists of factual news media accounts of the events of that period. The publicity petitioner has received, while “not kind,” Skilling, 561 U.S. at 382, 130 S.Ct. 2896, has not been of the grossly prejudicial character that attended Rideau.
The nearly two years that have passed since the Marathon bombings has allowed the decibel level of publicity about the crimes themselves to drop and community passions to diminish. See Patton v. Yount, 467 U.S. 1025, 1034, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). It is true that there has been ongoing media coverage of the advent of the trial and petitioner’s pre-trial motions, both locally and nationally. But that would be true wherever trial is held, and the reporting has largely been factual. These factors persuade us that petitioner has not demonstrated a clear and indisputable right to relief based on a presumption of prejudice from pretrial publicity.
Petitioner’s heavy reliance on Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), does not assist him. The facts are very different. Irvin must also be understood in light of later caselaw such as Skilling and Patton. In Irvin, a state habeas case, the defendant was suspected of committing six murders near Evansville, Indiana. He was arrested and thereafter a barrage of highly personalized publicity “was unleashed against him during the six or seven months preceding his trial,” id. at 725, 81 S.Ct. 1639, including a statement by the police and prosecutor that he had confessed to all six murders. Id. at 719-20, 81 S.Ct. 1639. Indeed, many of the press references described the defendant as the “confessed slayer of six, a parole violator and fraudulent-check artist.” Id. at 726, 81 S.Ct. 1639 (internal quotation marks omitted). In addition to the reported confession, there were stories about Irvin’s criminal history, his police line-up identification, that he faced a lie detector test, and that he had been placed at the scene of the crime. The press reported Irvin’s “offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted).” Id. at 725-26, 81 S.Ct. 1639. The very day before the trial, the newspapers reported that Irvin had admitted to all six murders. Id. at 726, 81 S.Ct. 1639.
After venue was moved to an adjoining county for his trial on one murder charge, the voir dire commenced only eleven months after the murder was committed and eight months after he was arrested and confessed. In that very small community of 30,000, in which the local newspapers containing the inflammatory articles were delivered to 95% of the households, the details of defendant’s confession and offer to plead guilty if promised a 99-year sentence, combined with the details of his criminal history, required vacation of the lower court judgments. The trial court itself excluded 62% of the venire “for cause as having fixed opinions as to” defendant’s guilt. Id. at 727, 81 S.Ct. 1639. Ninety percent of those prospective jurors undergoing voir dire — conducted, incidentally, “in front of all those remaining in the panel,” Patton v. Yount, 467 U.S. 1025, 1034 n. 10, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) — “entertained some opinion as to guilt — -ranging in intensity from mere suspicion to absolute certainty.” Irvin, 366 U.S. at 727, 81 S.Ct. 1639. The voir dire of the jurors who actually sat in judgment of the defendant revealed that eight of twelve thought he was .guilty at the outset. *23 Id. That is a far cry from the situation before this court.
Irvin, in fact, was followed twenty-three years later by Patton, where the Supreme Court found no denial of the defendant’s right to an impartial jury. There,
[t]he voir dire showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box. This was a higher percentage than in Irvin, where 62% of the 430 veniremen were dismissed for cause because they had fixed opinions concerning the petitioner’s guilt. Finally, ... 8 of the 14 jurors and alternates actually seated admitted that at some time they had formed an opinion as to Yount’s guilt.
Patton, 467 U.S. at 1029-30,104 S.Ct. 2885 (footnotes omitted). The Court emphasized the passage of time and its effect on the fixedness of prospective jurors’ opinions, saying some had forgotten and others “would need to be persuaded again.” Id. at 1034, 104 S.Ct. 2885 (footnote omitted). It was thus not simply the existence of opinions among prospective jurors, but the degree of their fixedness, that was critical to the Court. As the Court emphasized, “[prospective jurors represent a cross section of the community, and their education and experience vary widely.... Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially.” Id. at 1039, 104 S.Ct. 2885. This admonition undercuts petitioner’s key argument that poll percentages and jury questionnaire answers decide the question of a presumption of prejudice.
Here, we cannot say that the district court clearly and indisputably erred in concluding that the publicity surrounding petitioner’s pretrial proceedings — and the community’s knowledge about the Boston Marathon bombings — has not crossed from familiarity, as in Patton, to the prejudice evidenced in a case like Irvin.
Petitioner and the dissent also compare this case to a district court’s exercise of discretion to change venue in United States v. McVeigh, 918 F.Supp. 1467 (W.D.Okla.1996).[9] The issue in McVeigh was not whether the venue of the Oklahoma City bombing trial should be moved from Oklahoma City, where the crime was committed. The parties — including the government — agreed to move the trial. Id. at 1470. There is no such agreement here. The question in McVeigh, instead, was whether to move the trial elsewhere in Oklahoma or out of the state entirely.
That trial judge’s exercise of discretion in McVeigh to move the trial to Denver says nothing about how the trial judge here should exercise his discretion. Nor was it meant to. As the judge in McVeigh wrote, “[tjhere are so many variables involved that no two trials can be compared regardless of apparent similarities.” Id. at 1473. Insofar as the cases are similar, the McVeigh judge’s decision to move the trial to Denver does not suggest that a decision to keep this trial in Boston is an abuse of discretion — much less a clear and indisputable one.
The dissent asks the rhetorical question “if not here, when?” The Supreme Court answered that question in Rideau, where an unrepresented defendant’s twenty-minute, in-depth confession in the form of an “interview” with the Sheriff was recorded and broadcast multiple times in a small Louisiana parish. That interview and not *24 the later trial, the Court found, “in a very-real sense was Rideau’s trial — at which he pleaded guilty to murder.” Rideau, 373 U.S. at 726, 83 S.Ct. 1417. Three of the jurors had viewed the interview at least once, and two members of the jury were deputy sheriffs. Id. at 725, 83 S.Ct. 1417. Here, by contrast, no such thing occurred.[10]

C. The Ongoing Jurg Selection Process Does Not Suggest Pervasive Prejudice.

Beyond the publicity itself, petitioner also relies on the responses to jury questionnaires and the content of the voir dire as a basis for finding prejudice. He asserts that what we have seen from the juror selection process confirms that pretrial publicity has indisputably raised a presumption of prejudice sufficient to mandate that his trial be moved. Petitioner’s essential claim is thus that the prejudice against him is so great that nothing the district court can do will offset it. Every potential juror in the Eastern Division of Massachusetts is automatically disqualified, he maintains. That alone is a remarkable assumption about the five million people in the Eastern Division and one much to be doubted. Our dissenting colleague, too, argues that this “second analytical route,” based on the course of the jury selection to date, reveals an irrefutable presumption of prejudice among the jury pool. The careful selection process and the trial judge’s expressed confidence in finding sufficient jurors, however, is supported by the record and persuasively undercuts this argument.[11]
First, it is necessary to describe the ongoing jury selection process that has been underway in the district court. In doing so, we observe that our caselaw says that “[a] guiding beacon ... is the trial judge, who is responsible for conducting the voir dire and to whom we defer from our more distant appellate position.” Quiles-Olivo, 684 F.3d at 183. The process utilized here in many ways mirrors the one which the Supreme Court found appropriate in Skilling. See 561 U.S. at 387-89, 130 S.Ct. 2896. Here, the district judge summoned over a thousand prospective jurors, divided those jurors into six panels, and requested that they fill out a long and detailed one-hundred-question questionnaire under oath. The parties were permitted to confer and file under seal a report with respect to each panel, listing the persons whom the parties agreed should be excused for cause. Thereafter, the parties were ordered to file separately under seal a report suggesting specific follow-up issues or questions to be pursued in the course of individual voir dire.
Smaller groups of twenty to twenty-five prospective jurors have come to the Bos *25 ton courthouse,[12] and, one by one, have been questioned first by the court and then with follow-up from the parties. At the end of each day, counsel have conferred and agreed that certain jurors should be struck for cause or for hardship. The court has heard argument on contested jurors and reached a decision about which prospective jurors in the day’s group may be deemed provisionally qualified.
We have reviewed the entire voir dire conducted to this point by the court and the parties and the process has been thorough and appropriately calibrated to expose bias, ignorance, and prevarication.[13] As the district court noted in denying the Third Motion for Change of Venue,
the experience of voir dire suggests ... that the full process — including summonsing an expanded jury pool; utilizing a lengthy questionnaire jointly developed by the parties and the [e]ourt; giving the parties ample time to review questionnaires, research jurors, and consult with their jury selection advisers; and permitting both the [c]ourt and the parties to conduct thorough voir dire — is working to ferret out those jurors who should appropriately be excused for cause.
Our dissenting colleague comes to the opposite conclusion, claiming that the length of the jury selection process and the responses of the venire thus far indicate pervasive prejudice. In doing so, however, the dissent confuses mere exposure to publicity with “disqualifying prejudice” — only the second of which, when widespread throughout the jury pool, is particularly relevant to a presumption of prejudice. See United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990) (“Where a high percentage of the venire admits to a disqualifying prejudice, about civic resilience and recovery. It is not about whether petitioner is guilty or not of the crimes charged. That someone buys a Boston Strong T-shirt is not proof that he or she could not be fair and impartial if selected as a potential juror on the question of guilt, a court may properly question the remaining jurors’ avowals of impartiality....” (emphasis added)).
As an initial matter, the dissent contends that the length of the jury selection process in this case has its genesis in the pervasive prejudice permeating through the jury pool. But a jury selection process *26 of several weeks in length is not unusual in either contemporary or historical terms.[14] “[M]ajor cases have been known to require six weeks or more before the jury is seated.” David W. Neubauer & Stephen S. Meinhold, Judicial Process: Law, Courts, and Politics in the United States 358 (6th ed.2013). Despite all the hay the dissent makes of petitioner’s eligibility for the death penalty, that reality all but guarantees a longer, more detailed selection process.[15] In fact, the jury selection process in this case is perfectly comparable in length with the only other recent capital jury selection processes in the District of Massachusetts. See United States v. Sampson, No. 1:01-cr-10384 (D.Mass.) (seventeen days of jury selection running from September 18, 2003 to October 27, 2003); United States v. Gilbert, No. 3:98-cr-30044 (D.Mass.) (nineteen days of jury selection running from October 16, 2000 through November 17, 2000, provisionally qualifying only approximately two to seven jurors per day).
Moreover, it defies logic to count the efforts the district court has taken to carefully explore, and eliminate, any prejudice as showing the existence of the same.[16] In this case, it is entirely unsurprising that the district court, and the parties, have taken ample time to carefully differentiate between those individual jurors who have been exposed to publicity but are able to put that exposure aside and those who have developed an opinion they cannot put aside. Together, the careful process employed by the district court, including the “face-to-face opportunity to gauge demean- or and credibility,” and the “information from the questionnaires regarding jurors’ backgrounds, opinions, and sources of news” have afforded the district court “a sturdy foundation to assess fitness for jury service.” Skilling, 561 U.S. at 395, 130 S.Ct. 2896. We should commend, not decry, district courts’ rigorous efforts to ensure defendants are guaranteed a trial commensurate with their Sixth Amendment rights.
Our dissenting colleague also quotes a variety of allegedly “representative” juror responses in an effort to demonstrate that the jury pool is rife with disqualifying prejudice that requires us to doubt the avowals of impartiality from all members of the venire. But the reality of the record is *27 that those comments, selectively plucked from the questionnaire responses or voir dire testimony of over 1,300 jurors, are nothing close to representative.[17] It is a disservice to the judicial system to claim otherwise.
The majority of the quoted statements in the dissent regarding views of Tsarnaev’s guilt, and all of the most extreme, come from the questionnaires of jurors who the parties agreed to excuse and were excused without individual questioning. In that sense, the parties and the court have plainly acknowledged that those members of the pool are not representative of the more than 250 pool members who, by contrast, have thus far been called back for individual questioning. Still other quotes involve statements made to potential jurors by acquaintances or coworkers which are hardly probative of the potential juror’s own attitudes. In any event, those jurors were never provisionally qualified. They were either not called back for individual voir dire or struck for cause after the district judge was able to assess their demeanor in person. While a single juror has been provisionally qualified among the group whom the dissent discusses as having expressed views on guilt, the full context of his or her mild statement made clear that he or she was able to put aside any initial impressions he or she may hold — and, we note, the defense also did not object to that juror for cause.[18]
Nor do we think such statements are so common among the pool of excused jurors that a court must infer bias among others who have been provisionally qualified. It is not surprising that in a pool of over a thousand jurors with varying opinions, some will make strong statements that disqualify them from jury service. Others have expressed their ability to be fair and impartial. The honesty of their answers, conscious and subconscious, has been probed by extensive voir dire, as the Supreme Court approved in Skilling.
The putative “personal connections” proffered by the dissent also are mischaracterizations of the record. Many of the connections attributed to prospective jurors are, clearly, attenuated or tangential. And all but two of those quoted come from the questionnaires of jurors whose panels have not yet been questioned. The record gives us no reason to doubt that, like their congeners from the first several panels, those with the closest connections will be struck on the agreement ’of the parties or *28 by the court for cause. Of the three quotations presented by the dissent that are among the panels already questioned, one juror was not called for individual questioning and the other two were struck for cause following questioning.
Finally, as for the exposure to publicity, we emphasize again that “juror impartiality ... does not require ignorance.” Skilling, 561 U.S. at 381, 130 S.Ct. 2896 (emphasis in original). The fact that many of the jurors have been exposed to some measure of publicity, alone, is not probative of any “pervasive prejudice” in the jury pool. In addition, four of the dissent’s nine selective statements are from the statements of a single juror during voir dire; a juror, moreover, who was struck on the government’s motion for cause. It is, in any event, black letter law that “extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair.” Dobbert v. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (emphasis added). “To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard.” Irvin, 366 U.S. at 723, 81 S.Ct. 1639.
Ultimately, rather than a voir dire taking a total of five hours, as in Skilling, the voir, dire in this ease has taken — appropriately we think — several weeks. To the extent that the dissent suggests that this lengthy voir dire, and the sentiment it has demonstrated, indicates that a presumption of prejudice exists which cannot be overcome, we disagree. We cannot say that the procedures put in place by the trial judge are either insufficient on their face or so inadequately implemented as to justify an interruption of the process and a change of venue. Nor are we convinced that the results thus far compel such a drastic step. Indeed, as the district court noted, “the defendant’s presentation of a series of selective quotations from the 1300-plus questionnaires is misleading because the quotations are not fairly representative of the content of the questionnaires generally.” So too, in the filings before us and in the dissent. In sum, neither the length of the district court’s careful selection process nor the sentiments of the venire as a whole provide any basis for concluding, on mandamus, that pervasive prejudice taints the entire jury pool.
D. Petitioner Has Not Demonstrated Irreparable Harm.
Petitioner has not established a clear and indisputable right to relief but we address irreparable injury in any event. The law is designed to prevent use of mandamus to circumvent normal post-trial appellate review, as petitioner attempts here. Cheney, 542 U.S. at 380, 124 S.Ct. 2576. In the event that petitioner is convicted on one or more of the charges against him, he will have the right to appeal his conviction and sentence to this court and may raise the venue argument again. That double layer of review is itself a guarantee of due process.[19] For that *29 reason petitioner will not suffer irreparable injury nor can he show irreparable injury to the courts.
Petitioner relies heavily on our decision in Bulger to argue that both he and the reputation of the legal system will suffer irreparable injury if he does not prevail on his pretrial petition. Bulger involved a very different question and different standards. There the question was whether a reasonable member of the public might question the judge’s ability to preside impartially, due to the nature of his prior employment. In re Bulger, 710 F.3d at 49. No such issue is presented here. In Bulger, as well, the other conditions for mandamus were met. Here, they have not been met.
E. The Balance of Equities do not Favor Granting Mandamus.
Given petitioner’s failure to meet the prior two standards, he is not entitled to test the balance of the equities. But even then, the balance of the equities does not favor petitioner, whose arguments insufficiently credit the Constitution’s provisions that the trial be held where the crimes were committed. Tsarnaev’s peers in the Boston area will constitute the jury. Members of the community will have access to the trial and to the court room and spillover courtrooms. The victims and witnesses are located here and will not be forced to undertake the burdens of travel elsewhere. The same is true of those who have known petitioner as a resident and member of the community.
Moreover and most importantly, this Petition requests that we interfere in the careful jury selection process that has been ongoing in the district court, despite the fact that the petitioner remains able to raise claims of lack of an impartial jury on direct appeal. Such direct interference in an ongoing trial matter by an appellate court is inimical to our process of justice and our respect for the reasoned decisions of district court judges. Just as we are unable to conclude that it is clear and indisputable that the petitioner cannot receive a fair trial by an impartial jury in the Eastern Division of Massachusetts, the relevant interests weigh in favor of allowing the jury selection process to continue. And they weigh against taking the unprecedented step of abandoning our “primary reliance on the judgment of the trial court.” Skilling, 561 U.S. at 386, 130 S.Ct. 2896 (quoting Mu’Min, 500 U.S. at 427, 111 S.Ct. 1899) (internal quotation marks omitted).
III.
The Second Petition for Mandamus is denied.

. The parties have each received twenty-three peremptory challenges, three more than required by the applicable rule. Fed.R.Crim.P. 24(b)(1).

. Rule 21(a) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant’s motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.” "Generally, a presumption of prejudice is reserved for those extreme cases where publicity is both extensive and sensational in nature. Stated differently, Rule 21(a)’s requirements tend to almost exclusively apply in cases in which pervasive pretrial publicity has inflamed passions in the host community past the breaking point.” Quiles-Olivo, 684 F.3d at 182 (1st Cir.2012) (citations, internal quotation marks, and alteration omitted).

. At oral argument, it was the position of petitioner that denials of motions to change venue are reviewed for abuse of discretion and that a clear abuse of discretion would give rise to a clear entitlement to relief. Petitioner characterized “the change of venue in this case” as being "at the heart of the Sixth Amendment” right to trial by an impartial jury.

. For purposes of this opinion, we will assume that the petitioner can prove his argument that the district court's denial of the pretrial Third Motion for Change of Venue is subject to mandamus review at all, see In re Kouri-Perez, 134 F.3d 361 (1st Cir.1998) (unpublished per curiam), though not all circuit courts agree.

. The “provisionally qualified” jurors are still to be subject to peremptory challenges.

. Skilling first moved for change of venue four months after he was indicted; he renewed the motion three weeks before trial, shortly after a co-defendant pleaded guilty. See Skilling, 561 U.S. at 369, 372, 130 S.Ct. 2896. Skilling’s trial did take place without changing venue and his claims were thereafter considered and rejected on direct appeal.

. We have a different view than the dissent’s description of the courthouse and its environs. While jury selection has been going on there was not a courthouse view of a dump truck or a view of a construction site showing a Boston Strong banner. Presumably the dissent is referring to a photograph taken of a banner on a partially constructed building from early 2014, which has not been present during jury selection in 2015. Nothing can be seen from the courthouse of any banner at this time. Nor has the petitioner claimed that any members of the jury pool present at the courthouse were exposed to the cement mixer on the single day it was present in the area. Even if these assertions were true, that does not show presumed prejudice of any sort.

. Indeed, the Court relied on prior cases in which so-called "voluntary confessions” were extracted by brutal force. Rideau, 373 U.S. at 726, 83 S.Ct. 1417.

. In footnote 36 of the dissent, our dissenting colleague has made an unfounded argument that not even petitioner has made.

. The dissent's remarkable statement that the image of the petitioner being taken from a boat was "quite likely seen by nearly 100% of the Eastern Division of Massachusetts population” is completely unfounded; we can find no basis in the record for that contention.

. Petitioner does not make an argument that his jury will suffer from actual prejudice. Nor could he. A post-trial finding of "[ajctual prejudice hinges on whether the jurors seated at trial demonstrated actual partiality that they were incapable of setting aside.” Quiles-Olivo, 684 F.3d at 183 (citation and internal quotation marks omitted). At this point, a jury is in the process of being selected and has not been seated for trial. There can be no viable claim that the yet unseated and not even finally qualified jurors would result in a jury which suffers from actual prejudice. To the extent petitioner now claims that all of the provisionally qualified jurors suffer from presumed or actual prejudice, our review of the entire record satisfied us that it is not clear and indisputable the provisionally qualified jurors are biased or that the district court erred.

. Petitioner has never made the claims now made by the dissent that security arrangements at the Boston courthouse as to the trial have somehow contaminated the potential jury pool, such that the jurors eventually picked cannot be fair and impartial. Indeed, we reject the dissent’s "impression” that security is necessary because petitioner is "extraordinarily dangerous.” Security, to the contrary, no doubt will contribute to the safe and orderly conduct of the trial. Further, the dissent cannot and does not purport to describe the security arrangements for the jurors who will sit. Importantly, even if this case were transferred to a federal courthouse in another place, appropriately high security arrangements would be in place. This simply is not an appropriate consideration in this case.

. The bombings in Boston, the murder of a policeman, and the other criminal events charged did in fact take place and were heavily covered by the media around the world. As Reynolds instructs, that is a separate matter from the matter of whether petitioner is guilty of the crimes charged. See 98 U.S. at 155-56. Seeing media coverage of the former does not mean the viewer is prejudiced. Further, many in the provisionally qualified pool did not follow that coverage. Similarly, the Boston Strong theme is about civic resilience and recovery. It is not about whether petitioner is guilty or not of the crimes charged. That someone buys a Boston Strong T-shirt is not proof that he or she could not be fair and impartial if selected as a potential juror on the question of guilt.

.Jury selection can sometimes take weeks, particularly in complicated or high-profile cases. See, e.g., Miller-El v. Cockrell, 537 U.S. 322, 328, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (noting that jury selection in capital murder case took five weeks); State v. Addison, 165 N.H. 381, 87 A.3d 1, 57 (2013) (explaining that jury selection, from "a larger than usual jury pool,” look "approximately seventeen days” during which time "over 300 prospective jurors reported to the courthouse for jury selection”); Davis v. State, 93 Md. App. 89, 611 A.2d 1008, 1010 (Md.Ct. Spec.App.1992) (noting that in "states such as California and Florida and New York ... jury selection in celebrity cases may consume three or four weeks”). And, historically, a lengthy jury selection process is nothing novel. -See William H. Levit et al., Expediting Voir Dire: An Empirical Study, 44 S. Cal. L.Rev. 916, 923 & n.28 (1971). For example, jury selection for the trial of Black Panther Bobby Seale took thirteen weeks and required the examination of 1550 potential jurors. Id. at 923 n. 28. And the murder trial of Charles Manson featured a six week voir dire process. Id.

. See Bill Hawkins, Capital Punishment and the Administration of Justice: A Trial Prosecutor's Perspective, 89 Judicature 258, 259 (2006) (ndting that, in Texas, selection in counties that often handle death-penalty cases typically takes three weeks, while in locales where the death penalty is a "rare instance” selection "may last much longer”).

. The dissent makes the argument that any jury found to be unbiased during voir dire in fact then cannot be "indifferent.” This is topsy turvy.

. We explain the limited relevance of these statements specific to each category the dissent lists. However, it is worth describing them in the aggregate and mentioning what the dissent does not. Of the thirty-two selective quotations the dissent presents in bullet-point fashion, see Dissenting op. at 35-37, twenty-one come from jurors who were stricken by the district court, or by agreement of the parties, for cause. Eight more come from the questionnaires of jurors whose panels have not yet been individually questioned. Given the results of the voir dire process thus far, nothing in the record suggests that any of those jurors expressing bias will nevertheless be provisionally qualified. Finally, while three quotes do come from the voir dire of two provisionally qualified jurors, taken in the context of those jurors’ entire voir dire, there is no indication that those jurors are biased.

. The dissent notes, in passing, that one of the provisionally qualified jurors selected on his or her questionnaire that he or she would be “unable” to put aside his or her opinion regarding the defendant’s guilt. But the parties expressed no concern about this juror and, any concern that may have been warranted by the juror’s initial selection on the questionnaire, was eliminated by voir dire. During questioning the juror evidenced a clear and unequivocal ability to base his or her decision solely on the evidence presented during trial. Indeed, the defense neither asked about this juror's questionnaire answer nor objected to the juror's qualification for cause.

. The dissent's claims to the contrary are confusing and contradictory, to say the least. Despite maintaining throughout his opinion that the decibel of publicity in the Boston area has been much greater, and more consistent, while the coverage nationwide has slowly dwindled, see Dissenting op. at 31-32, 34, 43-44, our dissenting colleague suddenly claims exactly the opposite. He contends that a case of this magnitude will face unique difficulties for retrial elsewhere because any subsequent jury — presumably one outside of Massachusetts, if any conviction is overturned on venue grounds — will be "exposed to the *29 daily events of the first trial,” “the testimony given by the victims, the witnesses, and the experts," and "all the evidence presented by the government.” Dissenting op. at 46. Yet, we are puzzled at how the dissent can con-elude such publicity, and irreparable harm, will be produced in locations that, the dissent so vigorously contends pages earlier, have paid far less attention to this case.